Claremont Family Division
No. 2007-877

IN RE KIRSTEN P.

Argued: November 12, 2008
Opinion Issued: December 5, 2008

*Kelly A. Ayotte*, attorney general (*Susan P. McGinnis*, senior assistant attorney general, on the brief and orally), for the State.

*Theodore Lothstein*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

GALWAY, J. The juvenile, Kirsten P., appeals the order of the Claremont Family Division (*Yazinski*, J.) denying her motion to dismiss the delinquency petition against her. *See* RSA ch. 169-B (Supp. 2008). We affirm.

The following facts are supported by the record. On August 27, 2007, the fourteen-year-old juvenile drove her mother's vehicle the wrong way down a one-way street in Claremont. Sergeant Jeremy Wilson of the Claremont Police Department witnessed the event and stopped the vehicle. The juvenile was released into the custody of her mother.

Wilson filed a delinquency petition on August 30, 2007, and the juvenile's arraignment took place on September 12, 2007. Sixteen days later, on September 28, the juvenile moved to dismiss the petition with prejudice because her mother, along with the juvenile's legal custodian, had not been properly served with a summons and notice pursuant to RSA 169-B:7 (requiring service no less than twenty four hours and no more than seven days before hearing). Although the record is not clear-cut, it appears that both the juvenile's mother and foster mother were present at the arraignment, although neither had been properly served. The juvenile's mother waived timely service at the arraignment. However, the juvenile argued that her mother's waiver was insufficient because the juvenile was in the custody of the New Hampshire Division for Children, Youth and Families, necessitating service on her legal custodian, her foster mother. It does not appear from the record that the juvenile's foster mother waived timely service. The Court (*Korbey*, J.) dismissed the petition without prejudice on October 4.

A second delinquency petition was filed the next day. The arraignment took place on October 11, and the adjudicatory hearing was scheduled for November 7. However, on November 2, the juvenile moved to dismiss the second petition, arguing that the adjudicatory hearing was scheduled outside of the prescribed statutory time limits. *See* RSA 169-B:14, II. RSA 169-B:14, II provides, in pertinent part: "The adjudicatory hearing shall be held within . . . 30 days of arraignment for minors not detained." The juvenile argued that, although the adjudicatory hearing on the second petition was scheduled to occur within thirty days of her second arraign-

ment date, the thirty-day time limit began to run from the date of her first arraignment on September 12, fifty-six days prior to the scheduled November 7 adjudicatory hearing. The Court (*Yazinski,* J.) denied the motion, and subsequently entered a finding of true on the petition. This appeal followed.

On appeal, the sole issue before us is whether the thirty-day time limit set forth in RSA 169-B:14, II began anew upon the juvenile's arraignment on a second delinquency petition when the original delinquency petition was dismissed upon motion by the juvenile. We conclude that it does.

We review the trial court's statutory interpretation *de novo. State v. Brown,* 155 N.H. 590, 591 (2007). In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *State v. Langill,* 157 N.H. 77, 84 (2008). When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used. *Id.* We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.*

RSA chapter 169-B is part of a comprehensive juvenile justice system that has as its primary concern the welfare of the child. *See In re Juvenile 2003-248,* 150 N.H. 751, 752 (2004). "It guarantees children their constitutional rights, and encourages the use of rehabilitative and treatment resources whenever possible." *In re Eric C.,* 124 N.H. 222, 224 (1983) (quotation and brackets omitted). "[O]ne of the principal goals of the juvenile statutes [is] to create procedural safeguards sufficient to protect individual rights against the vicissitudes of unlimited discretion." *In re Larry B.,* 125 N.H. 376, 380 (1984).

"The prescription of mandatory time limits, however, also reflects the concurrent legislative concern for procedural due process." *In re Russell C.,* 120 N.H. 260, 267 (1980). "Recognizing the impact that delays in a court proceeding may have on a juvenile, the statute's time limits on juvenile adjudicatory hearings are a legislative pronouncement of a child's right to the expeditious resolution of his alleged delinquency." *In re Eric C.,* 124 N.H. at 224 (quotation omitted). This thirty-day time limit is mandatory and "effectuate[s] a substantive right requiring the court to forfeit jurisdiction if not complied with." *Id.* (quotation omitted).

We have stated that a juvenile's right to the expeditious resolution of alleged delinquency is analogous to an adult offender's right to a speedy trial. *In re Russell C.,* 120 N.H. at 266; *In re Juvenile 2007-150,* 156 N.H. 800, 802 (2008). The juvenile contends that this similarity supports her

assertion that restarting the statutory clock with her second arraignment violated her right to a speedy adjudication. Specifically, relying upon *State v. Adams*, 133 N.H. 818 (1991), she argues that the interruption of proceedings occasioned by the dismissal and refiling of charges does not restart the clock for purposes of the constitutional speedy trial right, and, thus, should not have restarted the clock for purposes of RSA 169-B:14, II.

In *Adams*, the State entered a *nolle prosequi* on each of the defendant's two pending indictments after concluding that there was insufficient evidence to support an element of the alleged offenses. *Adams*, 133 N.H. at 821-22. The State subsequently reindicted the defendant, and he was eventually convicted. *Id.* at 822. On appeal, he challenged the delay between his original indictments in November 1986 and his trial in March 1989, arguing it violated his right to a speedy trial. *Id.* at 823. Prior to *Adams*, we held that when the State enters a *nolle prosequi* in good faith and subsequently reindicts based upon the same conduct, "the relevant period of time to be considered for purposes of speedy trial analysis begins to run from the time of the second indictment and does not include the time the first indictment was pending." *Id.* However, we determined that this view had to be "tempered by the reasoning and holding of the Court of Appeals for the First Circuit" in *United States v. Colombo*, 852 F.2d 19 (1st Cir. 1988). *Id.* In that case, the First Circuit determined that, when the government voluntarily dismisses charges and subsequently reindicts, the time during the pendency of the first indictment must be included in the Sixth Amendment speedy trial calculation. *Colombo*, 852 F.2d at 23. The First Circuit reasoned that to hold otherwise would allow the government "to nullify a defendant's speedy trial right by the simple expedient of dismissing and reindicting whenever speedy trial time was running out on its prosecution." *Id.* at 24. We adopted this reasoning in *Adams*, and concluded that "the relevant period of delay does in fact include the time the first indictments were pending." *Adams*, 133 N.H. at 823.

The juvenile contends that both *Adams* and *Colombo* "support the proposition that the dismissal and refiling of the petition in this case should not restart the juvenile time limits." We disagree. *Adams* and *Colombo* stand for the proposition that the speedy trial clock does not restart when an indictment is *nolle prossed* by the State and a defendant is subsequently reindicted. We specifically noted, quoting *Colombo*, that the reasoning behind this principle was to prevent the government from "nullify[ing] a defendant's speedy trial rights by the simple expedient of dismissing and reindicting." *Adams*, 133 N.H. at 823 (quotation omitted). This rationale does not apply to the circumstances of this case. Here, the original delinquency petition was dismissed as a direct result of a motion by the

juvenile requesting such action. Unlike in *Adams* and *Colombo*, the State did not take any action to terminate the original petition. To the contrary, the record demonstrates that the State objected to its dismissal and believed that the mother's waiver of service was sufficient to satisfy the notice requirements set forth in RSA 169-B:7. Further, the juvenile does not make any allegation of bad faith on the part of the State. Thus, the State did not nullify the juvenile's right to a speedy adjudication by initiating a dismissal that restarted the clock in its favor.

■ In *Colombo*, the First Circuit explicitly recognized the distinction between a dismissal initiated by a defendant and one initiated by the government in calculating the speedy trial clock. It stated:

> The courts have implicitly assumed that if an indictment is dismissed on motion of a defendant, and the defendant is subsequently reindicted for the same offense, only the delay in prosecution of the second indictment is relevant for Sixth Amendment speedy trial purposes. Not only is this consistent with the judgment embodied in the Speedy Trial Act, but it makes sense. Once a defendant manages to have all charges against him dismissed, the government must, against its will, re-commence the prosecution from square one, a time consuming process. The defendant's efforts, therefore, are the main reason for the delay.

> When the government voluntarily dismisses the charges, however, a different consideration comes into play. Again, the Speedy Trial Act recognizes this, and excludes only the time between indictments, and not the time during the pendency of the first indictment. This is a sound approach, and is equally applicable in Sixth Amendment analysis. Were it otherwise, the government would be able to nullify a defendant's speedy trial right by the simple expedient of dismissing and reindicting whenever speedy trial time was running out on its prosecution.

*Colombo*, 852 F.2d at 23-24 (citations omitted). Contrary to the juvenile's assertion, when analogized to *Colombo*, the statutory clock at issue here would restart under the circumstances of this case. We find the First Circuit's reasoning persuasive on this issue and conclude, consistent with speedy trial principles set forth in *Colombo* and adopted in *Adams*, that the statutory clock set forth in RSA 169-B:14, II restarts when the original petition is dismissed upon a successful motion by the juvenile.

For the first time at oral argument, the juvenile asked us to draw a distinction between her motion, a motion to dismiss with prejudice under which a second petition could not have been filed, and the relief actually

granted by the court, a dismissal without prejudice. Presumably, the juvenile intended to distinguish a dismissal at the request of the juvenile that anticipated the filing of a second petition from one that did not. However, the juvenile has not cited, nor are we able to find, any support for this distinction.

The juvenile maintains that restarting the clock with the arraignment on a second petition undermines the jurisdictional nature and due process objectives of the time limits. The juvenile specifically questions the potential for abuse by prosecutors who may withdraw a petition simply to restart the clock, arguing that "[t]he practical effect of such machinations would be to fundamentally alter the time limits, from a jurisdictional due process safeguard, to a mere procedural directive, easily circumvented." The juvenile might be correct if the clock restarted in every circumstance involving a dismissal and subsequent petition. However, our decision today is limited to situations in which the juvenile has moved for, and successfully obtained, dismissal of the petition against her.

██ We disagree that the policies at the core of this statute are undermined by allowing a juvenile-initiated dismissal to restart the clock. The juvenile correctly notes that one of the principal goals of the juvenile statutes is to create procedural safeguards "against the vicissitudes of unlimited discretion." *See In re Larry B.*, 125 N.H. at 380. However, allowing the clock to restart under the circumstances of this case does not confer unlimited discretion upon the court or the State in the adjudication of juvenile cases. The thirty-day time limit set forth in RSA 169-B:14, II remains unchanged. Thus, the juvenile continues to be protected against prolonged delays that postpone adjudication of the matter, consistent with the purpose of the statute. *See In re Eric C.*, 124 N.H. at 224.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.